## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **ELECTRONICS AND TELECOMMUNICATIONS RESEARCH INSTITUTE; UNIVERSITY-INDUSTRY COOPERATION GROUP OF KYUNG HEE UNIVERSITY,** | |
| **Plaintiffs,** | **Civil Action No.** |
| **v.** | |
| **SNAP INC.,** | **JURY TRIAL DEMANDED** |
| **Defendant.** | |

## ORIGINAL COMPLAINT

Plaintiffs Electronics and Telecommunications Research Institute ("ETRI") and University-Industry Cooperation Group of Kyung Hee University ("Kyung Hee University"), collectively "Plaintiffs," file this Original Complaint against Snap Inc. ("Snap," or "Defendant") and allege as follows:

## NATURE OF THE ACTION

1.      ETRI is a government research institution founded in 1976 in Daejeon, South Korea that has played a key role in advancing information and communication technology.  ETRI employs around 2,000 employees, the vast majority of whom are researchers.  As part of its research and development efforts, ETRI plays an active role in international standard setting organizations such as the International Telecommunication Union Telecommunication Standardization Sector ("ITU-T") and the ISO/IEC Joint Technical Committee ("JTC"), having held nine chair and vice-chair positions.  In total, ETRI employees hold over 80 leadership roles across various international standards development organizations.  ETRI is also an active developer of video coding technologies.  ETRI

1

has made many proposals to various ITU Recommendations and has been awarded hundreds of U.S. patents related to the HEVC video coding standard.

2.      Kyung Hee University is a private research university in Seoul, South Korea, founded in 1949, that, through its University-Industry Cooperation Group, holds numerous patents related to video coding technology and is a notable contributor to the development of video coding standards. Kyung Hee University and ETRI frequently collaborate, including with respect to video coding research, and have developed over 100 patent families together.

3.      Snap uses video coding technology as part of its Snapchat product, which allows users to share videos with each other and the public.  Snap performs video coding to make high-quality videos available on a wide range of devices over a range of connections.  Snap does this as part of applications and backend processes (together with associated equipment, the "Accused Services"), including for example transcoding and encoding for the purpose of providing videos to users, that infringe one or more claims in Plaintiffs' Asserted Patents (as defined below).

4.      Snap relies on Plaintiffs' innovations to efficiently deliver high-quality video to users throughout the United States and the world.  Plaintiffs' patented technology is critical to Snap's business, driving the efficiency and quality of the videos that help keep users engaged on the application.  While other companies have recognized and validated the strength of Plaintiffs' video patent portfolio by taking licenses, Snap continues to use Plaintiffs' patented technology without a license, thereby obtaining an unfair competitive advantage and failing to fairly compensate Plaintiffs. Plaintiffs bring this lawsuit to end Snap's unlicensed use of Plaintiffs' patented technology.

**PARTIES**

5.      ETRI is based in the Republic of Korea (South Korea) with an address at 218 Gajeong-ro, Yuseong-gu, Daejeon, 34129, Korea.

6.      Kyung Hee University is based in the Republic of Korea (South Korea) with an address at

26, Kyungheedae-ro, Dongdaemun-gu, Seoul, 02447.

7. ETRI and Kyung Hee University are the owners by assignment of all right, title, and interest in U.S. Patent No. 11,595,643 (the "'643 Patent") and U.S. Patent No. 9,883,182 (the "'182 Patent"). ETRI is the sole owner by assignment of all right, title, and interest in U.S. Patent No. 10,021,416 (the "'416 Patent").

8. The '643 Patent, the '182 Patent, and the '416 Patent are collectively referred to as the "Asserted Patents."

9. On information and belief, Snap Inc. is a corporation organized under the laws of the State of Delaware.

10. On information and belief, Snap Inc. has its principal place of business at 2772 Donald Douglas Loop N, Santa Monica, CA 90405, and 3000 31st Street, Santa Monica, CA 90405.

## JURISDICTION AND VENUE

11. This Court has exclusive subject matter jurisdiction over the patent infringement claims in this case under 28 U.S.C. §§ 1331 and 1338.

12. The Court also has supplemental jurisdiction over all claims other than the patent infringement claims in this case under 28 U.S.C. § 1367(a), including over Count IV (declaratory judgment that Plaintiffs have complied with any RAND commitments). An actual controversy over all counts exists between the parties to this case.

13. This Court has general personal jurisdiction over Snap Inc. by virtue of Snap Inc.'s incorporation in Delaware. Snap has appointed a registered agent for service of process: Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

14. This Court has specific personal jurisdiction over Snap because Snap has, directly and/or through agents and/or intermediaries, committed acts and continues to commit acts of patent infringement, including within Delaware, giving rise to this action and has established minimum

contacts with Delaware such that the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice.

15.    Snap, among other things, uses the infringing Accused Services to decode videos submitted to the Snapchat platform from submitters around the world, including in Delaware; to encode those videos in suitable formats for distribution; and to place one or more encoded video bitstreams into the stream of commerce over the internet with the knowledge and/or understanding that such Accused Services were being utilized for the purpose of offering services and videos in Delaware.

16.    On information and belief, Snap regularly conducts and has conducted business in Delaware and purposefully avails itself of the privileges of conducting business in Delaware.  On information and belief, Snap, and/or its agents and/or intermediaries, makes, uses, imports, offers for sale, sells, and/or advertises its products and affiliated services in Delaware, sufficient to give rise to jurisdiction.

17.    On information and belief, Snap derives and has derived substantial revenue from the Accused Services within Delaware, and/or expects or should reasonably expect its actions to have consequences in Delaware.

18.    Snap's infringing activity has led to foreseeable harm and injury to Plaintiffs.

19.    Venue is proper under 28 U.S.C. § 1391 and 28 U.S.C. § 1400(b).  As set forth above, Snap has committed acts of infringement in this District and is incorporated in this District.

## **FACTUAL BACKGROUND**

20.    For many years, Plaintiffs have been leaders in innovating and delivering cutting-edge research that enables faster, more efficient video communications, along with a variety of other technologies.

21.    Plaintiffs invent and license video coding technologies to improve the ways people experience media and communicate with each other, and Plaintiffs have been awarded hundreds of

patents related to the HEVC standard.

22.    Snap describes itself as a camera company focused on visual communication.  Its core product, Snapchat, is a platform known for its use of videos that can be posted and shared with friends and with the public.  Transmitting high-quality videos across digital networks is a core feature of Snapchat's success.

23.    Using the Snapchat app, a user can post a "Story," which is a photo or video shared for viewing by the user's friends, followers or public in the Snapchat app for a limited time.  When a user "posts" a Story, the video is first captured in digital form and initially compressed on the user's device by, at the direction of, or with the Snapchat application for upload to Snap's servers.  After a user's Story is received by Snap's backend servers, Snap uses one or more codecs to transcode (i.e., convert into digitally compressed variants) at different resolutions and bitrates (different versions of the Story optimized for different devices and network conditions).  When another user, follower, or the public attempts to view the posted Story, the server chooses the optimal variant of the video based on the viewer's device capabilities and bandwidth.    Ex.    7, https://eng.snap.com/gpu_transcoding_at_scale, at 1.

24.    Snap decodes videos (including "Stories" and other posts) from the format used by the uploading user device and encodes the video into formats, such as H.265 (High Efficiency Video Coding, or HEVC), used by other devices that view the video.  In doing so, Snap practices the Asserted Patents as part of its Accused Services.  Snap states: "We want to deliver the best video quality while ensuring smooth playback experience.  This means we need to leverage the most advanced codecs where we can.  HEVC (H265) allows us to deliver the same video quality with a smaller bitrate."  Ex. 7, https://eng.snap.com/gpu_transcoding_at_scale, at 1-2.

25.    Snap's testing shows that HEVC-compliant videos achieve both bitrate reduction and better

5

quality over H.264-compliant videos:



## HEVC vs H264

The following charts show the GPU transcoded HEVC videos achieved both bitrate reduction and slightly better quality than H264.

Bitrate                                    VMAF quality score

Ex. 7, https://eng.snap.com/gpu_transcoding_at_scale, at 2.

26.    Snap's blog shows a visual example of video transcoded into HEVC, demonstrating better video quality at approximately a 20% lower bitrate:



Ex. 7, https://eng.snap.com/gpu_transcoding_at_scale, at 3.

27.     Even though Snap acknowledges that it "need[s] to leverage the most advanced codecs," Ex. 7 at 1, Snap has not obtained the patent licenses required for Snap to lawfully do so without infringing Plaintiffs' patents.  Plaintiffs therefore seek relief for Snap's continued unlicensed use of Plaintiffs' patented technology.

### A.     THE ITU'S COMMON PATENT POLICY

28.     The International Telecommunication Union ("ITU") is a specialized agency of the United Nations responsible for coordinating global issues related to information and communication technologies.  It was originally established in 1865 to manage international telegraph networks and has since evolved into a central body for modern telecommunications and digital infrastructure.

29.     The ITU brings together governments, private companies, and technical experts to develop international standards, allocate radio spectrum, and improve global connectivity.  One of its sectors, known as ITU-T, develops technical standards (called "Recommendations") to ensure global interoperability of communication systems.

30.     One of the ITU-T's Recommendations is H.265, or High Efficiency Video Coding ("HEVC").  H.265 is a newer standard that provides more efficient coding than previous iterations.

31.     The ITU has a Common Patent Policy regarding the contributions that are ultimately included in a Recommendation and may be covered by one or more patent claims.

32.     The ITU summarized its patent policy as follows:

1. The ITU Telecommunication Standardization Bureau (TSB), the ITU Radiocommunication Bureau (BR) and the offices of the CEOs of ISO and IEC are not in a position to give authoritative or comprehensive information about evidence, validity or scope of patents or similar rights, but it is desirable that the fullest available information should be disclosed. Therefore, any party participating in the work of ITU, ISO or IEC should, from the outset, draw the attention of the Director of ITU-TSB, the Director of ITU-BR, or the offices of the CEOs of ISO or IEC, respectively, to any known patent or to any known pending patent application, either their own or of other organizations, although ITU, ISO or IEC are unable to verify the validity of any such information.

2. If a Recommendation | Deliverable is developed and such information as referred to in paragraph 1 has been disclosed, three different situations may arise:

2.1 The patent holder is willing to negotiate licences free of charge with other parties on a non-discriminatory basis on reasonable terms and conditions. Such negotiations are left to the parties concerned and are performed outside ITU-T/ITU-R/ISO/IEC.

2.2 The patent holder is willing to negotiate licences with other parties on a non-discriminatory basis on reasonable terms and conditions. Such negotiations are left to the parties concerned and are performed outside ITU-T/ITU-R/ISO/IEC.

2.3 The patent holder is not willing to comply with the provisions of either paragraph 2.1 or paragraph 2.2; in such case, the Recommendation | Deliverable shall not include provisions depending on the patent.

3. Whatever case applies (2.1, 2.2 or 2.3), the patent holder has to provide a written statement to be filed at ITU-TSB, ITU-BR or the offices of the CEOs of ISO or IEC, respectively, using the appropriate "Patent Statement and Licensing Declaration" form. This statement must not include additional provisions, conditions, or any other exclusion clauses in excess of what is provided for each case in the corresponding boxes of the form.

Ex. 8 (Common Patent Policy), https://www.itu.int/en/ITU-T/ipr/Pages/policy.aspx.

33.    According to the ITU's Guidelines for implementation of its patent policy, a declaration "declares the willingness to license in case part(s) or all of any proposals contained in contributions submitted by the organization are included in ITU-T Recommendation(s) and the included part(s) contain items that have been patented or for which patent applications have been filed and whose use would be required to implement ITU-T Recommendation(s)." Ex. 9 (Patent Policy Guidelines) at 3.

34.    Plaintiffs are prepared to grant licenses for implementations of the H.265 Standard to any patent claims essential to the H.265 Standard on reasonable and non-discriminatory ("RAND") terms and conditions as set forth in the ITU Common Patent Policy.

**B.    LICENSE OFFERS TO SNAP**

35.    Patent pools are cooperative licensing arrangements where patent holders aggregate their patents and license them collectively — through a single licensing framework — to one another or to third parties. By consolidating access to otherwise fragmented patent portfolios, patent pools

8

reduce transaction costs, eliminate the need for licensees to negotiate separately with each individual patent holder, and allow for a single, aggregate royalty rate to be distributed equitably among pool members. These efficiencies promote the widespread adoption of technical standards, facilitate downstream innovation by lowering barriers to market entry, and encourage the diffusion of technology across industries, ultimately benefiting consumers through greater product interoperability, reduced costs, and increased competition.

36. Consistent with these market benefits, Plaintiffs offer licenses to their patents at reasonable rates through Access Advance's Video Distribution Patent ("VDP") pool, which includes the Asserted Patents as well as others. On information and belief, on August 13, 2025, Access Advance contacted Snap via e-mail and invited it to license Access Advance's VDP pool, including the Asserted Patents. On information and belief, on November 21, 2025, Access Advance sent Snap a patent chart that included the Asserted Patents.

37. On information and belief, Access Advance's patent charts identified patents included in the VDP pool, including the Asserted Patents, and exemplary sections of the HEVC standard to which those patents relate. On information and belief, Access Advance also directed Snap to information describing the terms and pricing for a VDP license.

38. On information and belief, on November 24, 2025, Access Advance and Snap held a telephone call, and on the call, Access Advance explained the royalty structure of the pool to Snap. Snap argued that the royalties were too high and that the company was close to signing another licensing deal for HEVC soon and could not conclude another license shortly afterwards. However, Snap expressly recognized that most of the video content currently on its platform was processed and transmitted in HEVC.

39. On information and belief, on January 15, 2026, one day after having another telephone call

on January 14, 2026 (in which Access Advance again explained the royalty structure and patent coverage of the pool), Access Advance sent an email with several documents for Snap's review, including a draft Pool License Agreement, an exemplary royalty calculation model for semi-annual royalties under the VDP Pool license for Snap, a presentation explaining the pool and its licensing terms, and an economic analysis (and executive summary thereof) explaining why the VDP Pool royalties are RAND.

40.     At this point in time, on information and belief, Snap had all information needed to start licensing discussions: a list of patents, including cross-reference to the standard to determine their technical relevance, a draft license agreement, an explanation of the royalty calculation and a detailed explanation why those royalties are RAND.  Unfortunately, on information and belief, Snap did not engage in any meaningful negotiations.  Since Snap did not respond to Access Advance's last message, on information and belief, the pool sent a follow-up email to Snap on January 30, 2026, suggesting another phone call.  On information and belief, in its response, Snap admitted that it had not reviewed the material provided by Access Advance.  Nonetheless, on information and belief, Snap complained that Access Advance's message had focused on VVC (Snap would have realized that this is incorrect, if they had read the material provided).  Furthermore, on information and belief, Snap asked whether there was an overlap between the VDP Pool and the HEVC device Pool.

41.     On information and belief, Access Advance sent an email on February 9, 2026, and answered Snap's request and inquiries in detail.  In the email, Access Advance explained that the patents in the device pool and the content pool overlap substantially but not entirely and agreed to sign an NDA.  Access Advance also pointed out that the recently published rates of Avanci's HEVC pool for video content are substantially higher than those of Access Advance's VDP.  Again, Snap did not respond, and on information and belief Access Advance sent a reminder on February 25, 2026.

On information and belief, on March 3, 2026, Snap finally sent a draft NDA and proposed another call. On information and belief, additional discussions by phone and email ensued, but Snap still did not accept the VDP license.

42. On information and belief, Access Advance informed Snap on March 25, 2026, that a VDP licensor had filed a lawsuit against Snap in Brazil to stop the infringement of their HEVC and AV1 patents. On information and belief, Snap responded two days later and told Access Advance that in the light of the pending litigation Snap would "pause" the communication with the pool. On information and belief, Snap stated the following:

> "In light of the filing of these cases, you'll understand if we pause our discussions on the AA VDP pool for the time being. Of course, we will continue to reach out if we have any questions."

43. Since Snap's announcement to "pause" discussions with the pool, on information and belief, there has not been significant further communication. Plaintiffs are left with no choice but to proceed with litigation to stop the continued infringement of their patents by Snap.

44. Snap has been offered a license to the Asserted Patents under reasonable and non-discriminatory terms through the VDP pool. Access Advance explained to Snap that the VDP Pool license was based on reasonable and non-discriminatory terms and provided an efficient licensing solution for Snap. Access Advance further explained that, as an alternative, Snap could seek bilateral licenses from individual VDP Pool Licensors, such as Plaintiffs.

45. On information and belief, since the August 13, 2025, e-mail, Access Advance continued negotiating. Snap did not accept the offer to license the VDP Pool and did not seek any bilateral license from Plaintiffs.

46. Despite these efforts, Snap remains unlicensed. Snap has continued to use Plaintiffs' patented technology without paying any royalties.

47. Snap's continued unlicensed use of Plaintiffs' Asserted Patents has prompted Plaintiffs to

bring this action.

## PLAINTIFFS' ASSERTED PATENTS

48.    Snap has known about the Asserted Patents since at least November 24, 2023, as an HEVC Advance pool licensee. See Ex. 10, https://web.archive.org/web/20231124024701/https://accessadvance.com/hevc-advance-patentpool-licensees/ (showing that at least as of November 24, 2023, Snap Inc. was an HEVC Advance pool licensee). The HEVC Advance pool patent list includes the Asserted Patents. https://accessadvance.com/hevcadvance-patent-list/.

### A.  U.S. Patent No. 11,595,643

49.    ETRI and Kyung Hee University own by assignment the entire right, title, and interest in and to U.S. Patent No. 11,595,643 (the "'643 Patent"). The '643 Patent, entitled "Encoding method and decoding method, and device using same," issued on February 28, 2023, to inventors Hui Yong Kim, Gwang Hoon Park, Kyung Yong Kim, Sung Chang Lim, Jin Ho Lee, Jin Soo Choi, and Jin Woong Kim. ETRI and Kyung Hee University own all rights to the '643 Patent necessary to bring this action, including the rights to recover for pre-suit infringement to the fullest extent under any provision of law, including 35 U.S.C. §§ 284-287. The '643 Patent issued from U.S. Patent Application No. 17/707,057, filed on March 29, 2022. A true and correct copy of the '643 Patent is attached as Exhibit 1 and incorporated by reference herein.

50.    The U.S. Patent and Trademark Office also held in a re-examination proceeding that a claim, with certain overlapping scope to the exemplary claim of the '643 Patent referenced in this complaint, was valid, novel, and non-obvious over the prior art of record. See May 30, 2024 Re-Examination Decision finding validity of U.S. Patent No. 10,341,661.

51.    The '643 Patent is not directed to merely an abstract idea or any patent-ineligible concept. Instead, the '643 Patent is directed to novel and unconventional improvements to the frequency

transform and scanning of chroma signals in the field of digital video coding. The '643 Patent provides improvements over prior video coding techniques that result in substantial benefits to encoding and decoding efficiency, particularly for high-resolution video.

52. In video coding, pixel information includes a luma signal regarding luma and a chroma signal regarding chroma, and because the human sense of sight is more sensitive to luma, a luma signal and a chroma signal may be handled equally or differently. '643 Patent, 1:44-48. Accordingly, a method of effectively handling a chroma signal and a luma signal separately was problematic. *Id*. at 1:49-50.

53. One technique used in video coding is intra prediction. Intra prediction generates a prediction block by performing spatial prediction using values of the pixels of an already encoded block neighboring a current block of pixels. *Id*. at 4:50-53.

54. To adjust the predicted block to better match the actual data, after intra prediction, the residual picture (the difference between the predicted block and the actual block) is subject to frequency-domain transform, quantization, and entropy encoding. *Id*. at 4:66-5:9. To increase entropy encoding efficiency, the resulting two-dimensional quantized coefficients are rearranged into a one-dimensional form. *Id*. at 8:64-67.

55. In the prior art, a zigzag scanning method was used to perform this rearrangement. *Id*. at 9:1-4. The prior zigzag approach, however, did not adapt the frequency transform—such as a Discrete Cosine Transform (DCT) or Discrete Sine Transform (DST)—to best match the particular circumstances of the coding. *Id*. at 9:4-7.

56. The '643 Patent overcame these technical challenges by employing unconventional methods of adapting the frequency transform used. For example, the '643 Patent teaches that in order to increase encoding efficiency due to the frequency domain transform, integer transform, integer DCT,

13

integer DST, or intra-prediction mode-dependent DCT/DST can be applied selectively and adaptively depending on the size of a block. *Id*. at 10:51-55. Furthermore, the '643 Patent teaches that in some circumstances, integer DST may be applied in all horizontal and vertical directions other than a DC mode. *Id*. at 25:63-64. These unconventional choices improved encoding and decoding efficiency, improvements to the ability of computers to encode and decode video, and smaller video bitstreams.

57. The '643 Patent therefore provides a specific technological improvement to the functionality and capabilities of video coding technology that results in increased encoding and decoding efficiency. For example, by deciding to use DST for all intra prediction direction modes when a size of the current block corresponds to 4×4 and the color component of the current block is luma, while using DCT in certain other circumstances, the encoding efficiency of the residual signals of both the luma and chroma signals are improved.

58. Conventional technology prior to the '643 Patent was not capable of this efficiency, because it did not selectively adapt the frequency transform and scanning during coding. The '643 Patent recognizes and solves these specific technological problems that plagued the conventional technology at the time. The '643 Patent's ability to adaptively select the transform type for luma and chroma based on the intra prediction mode was a significant advancement over existing technology.

59. The novel solution of the '643 Patent was not well-understood, routine, or conventional, nor was it simply comprised of well-understood, routine, and conventional activities previously known to the industry. Furthermore, the combination of elements, including deriving an intra prediction mode of a current block; determining a scan type of the current block based on the intra prediction mode; deriving residual coefficients based on the scan type; determining a transform type to be a

DCT (Discrete Cosine Transform) or a DST (Discrete Sine Transform); and performing an inverse-transform on the residual coefficients based on the transform type, wherein when the size of the current block corresponds to 4×4 and the color component is a luma component, the inverse-transform is performed using DST in horizontal and vertical transform directions for all intra prediction direction modes and a planar mode, was not well-understood, routine, or conventional.

60.     The unconventional nature and technological improvements of the '643 Patent were recognized in the industry.  For example, on or around April 16, 2012, a group including many of the inventors of the '643 Patent submitted JCTVC-I0103, titled "Non-CE3: On scanIdxC derivation for chroma" to the Joint Collaborative Team on Video Coding (JCT-VC).  Ex. 11. Further, on or around April 17, 2012, the same group submitted JCTVC-I0415, titled "Mode-dependent DCT/DST for chroma," to JCT-VC.  Ex. 12.  Certain proposals from these submissions were ultimately adopted, based on their technical merits, in implementations of H.265 video coding such as those used by Snap today.

61.     Plaintiffs complied with any applicable marking requirements under 35 U.S.C. § 287 as to the '643 Patent at least because the asserted claims include method claims that do not require marking and/or there is nothing to mark.

### B.     U.S. Patent No. 9,883,182

62.     ETRI and Kyung Hee University own by assignment the entire right, title, and interest in and to U.S. Patent No. 9,883,182 (the "'182 Patent").  The '182 Patent, entitled "Method and apparatus for setting reference picture index of temporal merging candidate," issued on January 30, 2018, to inventors Hui Yong Kim, Gwang Hoon Park, Kyung Yong Kim, Sang Min Kim, Sung Chang Lim, Jin Ho Lee, Jin Soo Choi, and Jin Woong Kim.  ETRI and Kyung Hee University own all rights to the '182 Patent necessary to bring this action, including the rights to recover for pre-suit infringement to the fullest extent under any provision of law including 35 U.S.C. §§ 284-287.  The '182 Patent

15

issued from U.S. Patent Application No. 14/823,186, filed on August 11, 2015.  A true and correct copy of the '182 Patent is attached as Exhibit 2 and incorporated by reference herein.

63.     The '182 Patent is not directed to merely an abstract idea or any patent-ineligible concept. Instead, the '182 Patent is directed to novel and unconventional improvements to the derivation of the reference picture index of a temporal merging candidate used in inter-frame prediction in the field of digital video coding.  The '182 Patent provides improvements over prior temporal-merging-candidate derivation techniques that result in substantial benefits to the processing speed and computational efficiency of video encoding and decoding.

64.     In video compression, inter-frame prediction uses motion prediction information to predict a block in a current picture from a block located in a previously coded picture.  '182 Patent at 10:65-11:5.  Merge mode is one way of providing this motion prediction information using a smaller number of bits by indicating that the motion prediction information of a similar, neighboring block can be reused instead of explicitly coding motion vectors for the current block.  The reference picture index of the temporal merging candidate identifies the reference picture used in the temporal motion prediction of the current block.  *Id*. at 11:61-12:5.

65.     In the prior art, however, the reference picture index of a temporal merging candidate was derived from the reference picture index of a spatial merging candidate belonging to a neighboring prediction block, which required that neighboring block to have already been coded or decoded.  *Id*. at 12:23-12:42.  When one coding block was partitioned into multiple prediction blocks, some of the spatial merging candidate blocks needed to derive that reference picture index were located within the current coding block itself or at locations not yet coded or decoded, making it impossible to derive the reference picture index of a temporal merging candidate for a prediction block until an earlier prediction block in the same coding block had finished processing.  *Id*. at 12:42-13:4.  As a

16

result, the reference picture indices of temporal merging candidates for multiple prediction blocks within one coding block could not be derived in parallel. *Id.* at 13:4-13:19.

66.    The '182 Patent overcame these technical challenges by employing unconventional methods of deriving the reference picture index of a temporal merging candidate that do not depend on whether other prediction blocks within the same coding block have already been coded or decoded. *Id*. at 13:15-13:29.  For example, the '182 Patent teaches replacing a spatial merging candidate block located within the coding block, or at a location not yet coded or decoded, with an already-coded block located outside the coding block, *id*. at 17:4-17:34; or setting the reference picture index candidate derived from such a block to a fixed value, *id*. at 17:50-18:25.

67.    The '182 Patent therefore provides a specific technological improvement to the functionality of video coding technology that results in benefits including increased processing speed, coding efficiency, and reduced complexity.  Because the reference picture indices of temporal merging candidates for a plurality of prediction blocks within one coding block can be derived without waiting for prediction to be completed on other prediction blocks in that coding block, inter-frame prediction using merge mode can be performed on those prediction blocks in parallel.  *Id*. at 13:20-13:29, 19:1-19:13. This benefit is particularly significant for high-throughput applications, such as high-definition video, that require processing large amounts of image data.  *Id*. at 24:22-24:31.

68.    Conventional technology prior to the '182 Patent was not capable of this efficiency, because it required the reference picture index of a temporal merging candidate to be derived serially from spatial merging candidates that, in some cases, were not yet coded or decoded.  *Id.* at 12:42-13:14. The '182 Patent recognizes and solves this specific technological problem with the conventional technology at the time.  For example, the '182 Patent's ability to derive the reference picture index of a temporal merging candidate irrespective of whether other prediction blocks in the same coding

block have already been coded or decoded; determining a reference picture index of the spatial merging candidate based on a reference picture of the spatial neighboring block while a reference picture index of the temporal merging candidate is set to a fixed value of zero; and determining the spatial neighboring block and the temporal neighboring block based on a position of a coding block, a size of a block on which a parallel merge processing is applicable, and a size of the coding block, were significant advancements over existing technology.

69.     The novel solution of the '182 Patent was not well-understood, routine, or conventional, nor was it simply comprised of well-understood, routine, and conventional activities previously known to the industry.  Furthermore, the combination of elements, including selecting a collocated picture having a different temporal order from a current picture that includes a current prediction block, the collocated picture including a temporal neighboring block used to derive a temporal merging candidate of the current prediction block; deriving a spatial merging candidate from a spatial neighboring block; deriving the temporal merging candidate from the temporal neighboring block; generating a merging candidate list comprising the spatial merging candidate and the temporal merging candidate; and determining a motion vector and a reference picture index of the current prediction block using the merging candidate list, wherein a reference picture index of the spatial merging candidate is determined based on a reference picture of the spatial neighboring block while a reference picture index of the temporal merging candidate is set to a fixed value of zero, and wherein the spatial neighboring block and the temporal neighboring block are determined based on a position of a coding block, a size of a block on which a parallel merge processing is applicable, and a size of the coding block, was not well-understood, routine, or conventional.

70.     The unconventional nature and technological improvements of the '182 Patent were recognized in the industry.  For example, on or around January 20, 2012, a group including many of

18

the inventors of the '182 Patent submitted contribution JCTVC-H0240, titled "Non-CE9: Throughput improvement for merge/skip mode," to the Joint Collaborative Team on Video Coding (JCT-VC). Ex. 13. The contribution reported coding gains using improvements described and claimed in the '182 Patent. Certain proposals from this submission were ultimately adopted, based on their technical merits, in implementations of H.265 video coding such as those used by Snap today.

71.    The Examiner during prosecution also recognized the unconventional nature and technological improvements of the '182 Patent. Specifically, the Examiner in the November 22, 2017, Notice of Allowance provided an "Examiner's Comment on 35 USC 101" and noted that the "following two-prong analysis shows additional elements sufficient to amount to significantly more than" an abstract idea:

1st Prong (Problem and Solution): Disclosed in Specification [PGPUB 2017/0127059 A1] are (1) As the resolution and quality of image data become higher, the amount of the image data becomes relatively greater than that of the existing image data *[para. 0003]* which implies slow processing speed and (2) The present invention is to provide a method of setting the reference picture index of a temporal merging candidate *[para. 0007-0009]*, thereby inter-frame prediction using a temporal merging candidate can be performed on a plurality of prediction blocks in parallel by using a temporal merging candidate set to a specific value or using the reference picture index of a spatial merging candidate at a predetermined location as the reference picture index of a temporal merging candidate. **Accordingly, an image processing speed can be increased, and the complexity of image processing can be reduced** *[para. 0011; 0230]*.

19

2nd Prong (Invention Claimed): The invention claimed is directly related to generating a merging candidate list comprising the spatial merging candidate and the temporal merging candidate; determining a motion vector and a reference picture index of the current prediction block by using the merging candidate list; **wherein while a reference picture index of the spatial merging candidate is determined based on a reference picture of the spatial neighboring block, a reference picture index of the temporal merging candidate is set to a fixed value of zero wherein the spatial neighboring block and the temporal neighboring block are determined based on a position of a coding block, a size of a block on which a parallel merge processing is applicable, and a size of the coding block, wherein the coding block comprises the current prediction block**.

Ex. 14 at 4-5.

72.     Plaintiffs complied with any applicable marking requirements under 35 U.S.C. § 287 as to the '182 Patent at least because the asserted claims include method claims that do not require marking and/or there is nothing to mark.

        C.     **U.S. Patent No. 10,021,416**

73.     ETRI owns by assignment the entire right, title, and interest in and to U.S. Patent No. 10,021,416 (the "'416 Patent"). The '416 Patent, entitled "Method, apparatus, and bitstream for generating reconstructed blocks using filter for intra prediction mode," issued on July 10, 2018, to inventors Jin Ho Lee, Hui Yong Kim, Sung Chang Lim, Jin Soo Choi, and Jin Woong Kim. ETRI owns all rights to the '416 Patent necessary to bring this action, including the rights to recover for pre-suit infringement to the fullest extent under any provision of law including 35 U.S.C. §§ 284-287. The '416 Patent issued from U.S. Patent Application No. 15/069,314, filed on March 14, 2016. A true and correct copy of the '416 Patent is attached as Exhibit 3 and incorporated by reference herein.

20

74.    The '416 Patent is not directed to merely an abstract idea or any patent-ineligible concept. Instead, the '416 Patent is directed to novel and unconventional improvements to intra prediction and the filtering of prediction pixels in the field of digital video coding. The '416 Patent provides improvements over prior intra prediction techniques that result in substantial benefits to coding efficiency, particularly for high-resolution and high-definition video.

75.    In video coding, an intra predictor performs spatial prediction using the pixel values of already-encoded blocks around a current block to generate a prediction block. '416 Patent at 8:13-16. A persistent problem with conventional intra prediction is that prediction error is generated at the time of intra prediction and discontinuities arise between blocks, which degrade prediction efficiency and encoding efficiency. *Id*. at 12:54-67. Conventional intra prediction techniques did not adequately address the prediction error and inter-block discontinuity that resulted from generating the prediction block, and a need existed for a higher-efficiency compression technology for higher-resolution and higher-definition images. *Id*.

76.    The '416 Patent overcame these technical challenges by employing an unconventional method of performing filtering, where the filter type applied to the filtering target pixel and the filtering target region are determined based on the intra prediction mode. *Id*. at 2:7-20. For the DC mode, the filtering target region includes the left vertical prediction pixel line at the leftmost portion and the upper horizontal prediction pixel line at the uppermost portion of the prediction block. *Id*. at 2:21-27. The filter shape, filter tap, and filter coefficients for the DC mode are fixed for a plurality of block sizes. *Id*. at 2:33-37. Further, the '416 Patent teaches selectively using the particular filter for block sizes smaller than 32×32 because at this size the "correlation between pixels neighboring to the current block and/or pixels in the current block may be large" and in "this case, the filtering on the prediction block does not have an important meaning." *Id*. at 40:17-63, 47:55-65 (claim 3).

77.     The '416 Patent therefore provides a specific technological improvement to the functionality and capabilities of video coding technology that results in reduced prediction error and minimized discontinuity between blocks, thereby improving prediction efficiency and encoding efficiency.  For example, by filtering specific prediction pixels along the block boundaries according to the intra prediction mode, the patent reduces the prediction error generated during intra prediction and the discontinuity at block boundaries.  *Id*. at 12:54-13:9.  Because the prediction error is reduced and the discontinuity between the blocks is minimized, the invention makes it possible to improve the encoding/decoding efficiency, which results in the ability to represent high-quality videos with smaller video bitstreams.  *Id*.

78.     Conventional technology prior to the '416 Patent was not capable of this improvement, because it did not perform intra-prediction-mode-dependent filtering of prediction pixels to reduce prediction error and inter-block discontinuity.  The '416 Patent recognizes and solves these specific technological problems that plagued the conventional technology at the time.  The '416 Patent's ability to filter prediction pixels with a filter type and region determined by the intra prediction mode, using a filter with a filter shape, filter tap, and filter coefficients that are fixed for a plurality of block sizes, was a significant advancement over existing technology.

79.     The novel solution of the '416 Patent was not well-understood, routine, or conventional, nor was it simply comprised of well-understood, routine, and conventional activities previously known to the industry.  Furthermore, the combination of elements, including determining an intra prediction mode for a current block; generating a prediction block by performing intra prediction for a DC mode; and generating a reconstructed block based on the prediction block and a reconstructed residual block, wherein performing the intra prediction for the DC mode comprises generating prediction values of filtered prediction pixels using a filter for the DC mode and pixel values of

22

reconstructed reference pixels adjacent to the current block, the filtered prediction pixels being one or more pixels located in a vertical pixel line at the leftmost side and a horizontal pixel line at the uppermost side of the prediction block, and a filter shape, filter tap, and plurality of filter coefficients of the filter for the DC mode being fixed for a plurality of block sizes, was not well-understood, routine, or conventional.

80.     The unconventional nature and technological improvements of the '416 Patent were recognized in the industry.  For example, on or around July 1, 2011, a group including many of the inventors of the '416 Patent submitted JCTVC-F358, titled "Mode dependent filtering for intra predicted sample," to the Joint Collaborative Team on Video Coding (JCT-VC).  Ex. 15.  Certain proposals from this submission were ultimately adopted, based on their technical merits, in implementations of H.265 video coding such as those used by Snap today, and referenced in later JCT-VC submissions such as JCTVC-F649, titled "Cross-check of ETRI's proposal (JCTVC-F358) on mode dependent filtering for intra predicted samples."  Ex. 16.

81.     ETRI complied with any applicable marking requirements under 35 U.S.C. § 287 as to the '416 Patent at least because the asserted claims include method claims that do not require marking and/or there is nothing to mark.

### COUNT I: PATENT INFRINGEMENT OF THE '643 PATENT

82.     Plaintiffs incorporate by reference the preceding paragraphs as though fully set forth herein.

83.     Snap had knowledge and notice of the '643 Patent at least by November 24, 2023, and again through communications on November 21, 2025, and the filing of this complaint.

84.     Snap infringes the '643 Patent by, for example, making, using, selling, offering for sale, and/or importing in the United States apparatuses and/or methods covered by one or more claims of the '643 Patent and thus directly infringes the '643 Patent literally and/or under the Doctrine of Equivalents, in violation of 35 U.S.C. § 271.  For example, Snap directly infringes the '643 Patent

through its encoding of bitstreams into H.265-compliant (HEVC) formats on servers in the United States.

85.     On information and belief, Snap indirectly infringes claims of the '643 Patent, as provided in 35 U.S.C. § 271(b), by inducing infringement by others, such as Snap's partners and vendors in this District and elsewhere in the United States.  For example, on information and belief, as a result of Snap's inducement, service providers directly infringe the '643 Patent.  Snap has performed and continues to perform these affirmative acts with knowledge of the '643 Patent and with the intent, or willful blindness, that the induced acts directly infringe the '643 Patent.

86.     Upon information and belief, Snap derives revenue, directly and indirectly, from the activities relating to the Accused Services and to infringement of the '643 Patent, including in this District and elsewhere in the United States.

87.     Snap's infringement of the '643 Patent is willful and deliberate.  As detailed above, Snap had knowledge of the '643 Patent and had knowledge, or was willfully blind, as to its infringement of the '643 Patent.  As discussed above, Snap has had actual knowledge of the '643 Patent since at least November 24, 2023, when Access Advance notified Snap of the patent.  Further, as discussed above, Snap knew or should have known that its actions infringe and actively induce infringement of the '643 Patent.  As discussed above, Snap specifically intended that both itself and/or its service providers infringe the '643 Patent.

88.     Snap's infringement of the '643 Patent has damaged and will continue to damage Plaintiffs.

89.     Exemplary claim 2 of the '643 Patent recites:

> 2. A method for encoding a video signal, comprising:
> deriving an intra prediction mode of a current block;
> determining a scan type of the current block based on the intra prediction
> mode of the current block;

24

> deriving residual coefficients of the current block based on the scan type of the current block;
>
> determining a transform type of the current block to be a DCT (Discrete Cosine Transform) or a DST (Discrete Sine Transform); and
>
> performing an inverse-transform on the residual coefficients based on the transform type,
>
> wherein when a size of the current block corresponds to 4×4 and a color component of the current block is a luma component, the inverse-transform is performed by using DST in horizontal and vertical transform directions, for all intra prediction direction mode and a planar mode of the current block.

90.    Snap's Accused Services perform the method of Claim 2 of the '643 Patent.  An exemplary claim chart is attached as Exhibit 4 and is incorporated by reference herein.

91.    Plaintiffs are entitled to all rights to recover for present, past, and future infringement for the '643 Patent.  Plaintiffs are entitled to recover to the full extent allowable under 35 U.S.C. §§ 284-287, including for up to six years prior to the filing of this complaint.  There is no marking issue under 35 U.S.C. § 287 or otherwise which would limit damages, and Plaintiffs have complied with all relevant statutes for maximum recovery under the law.

## COUNT II: PATENT INFRINGEMENT OF THE '182 PATENT

92.    Plaintiffs incorporate by reference the preceding paragraphs as though fully set forth herein.

93.    Snap had knowledge and notice of the '182 Patent at least by November 24, 2023, and again through communications on November 21, 2025, and the filing of this complaint.

94.    Snap infringes the '182 Patent by, for example, making, using, selling, offering for sale, and/or importing in the United States apparatuses and/or methods covered by one or more claims of the '182 Patent and thus directly infringes the '182 Patent literally and/or under the Doctrine of Equivalents, in violation of 35 U.S.C. § 271.  For example, Snap directly infringes the '182 Patent through its decoding of bitstreams from H.265-compliant (HEVC) formats on servers in the United States.

95.    On information and belief, Snap indirectly infringes claims of the '182 Patent, as provided in 35 U.S.C. § 271(b), by inducing infringement by others, such as Snap's partners and vendors in this District and elsewhere in the United States.  For example, on information and belief, as a result of Snap's inducement, service providers directly infringe the '182 Patent.  Snap has performed and continues to perform these affirmative acts with knowledge of the '182 Patent and with the intent, or willful blindness, that the induced acts directly infringe the '182 Patent.

96.    Upon information and belief, Snap derives revenue, directly and indirectly, from the activities relating to the Accused Services and to infringement of the '182 Patent, including in this District and elsewhere in the United States.

97.    Snap's infringement of the '182 Patent is willful and deliberate.  As detailed above, Snap had knowledge of the '182 Patent and had knowledge, or was willfully blind, as to its infringement of the '182 Patent.  As discussed above, Snap has had actual knowledge of the '182 Patent since at least November 24, 2023, when Access Advance notified Snap of the patent.  Further, as discussed above, Snap knew or should have known that its actions infringe and actively induce infringement of the '182 Patent.  As discussed above, Snap specifically intended that both itself and/or its service providers infringe the '182 Patent.

98.    Snap's infringement of the '182 Patent has damaged and will continue to damage Plaintiffs.

99.    Exemplary claim 1 of the '182 Patent recites:

> 1. A method of decoding a video signal, comprising:
>
> selecting a collocated picture having a different temporal order from a current picture, the current picture comprising a current prediction block, the collocated picture comprising a temporal neighboring block that is used to derive a temporal merging candidate of the current prediction block;
>
> deriving a spatial merging candidate from a spatial neighboring block;
>
> deriving the temporal merging candidate from the temporal neighboring block;

generating a merging candidate list comprising the spatial merging candidate and the temporal merging candidate;

determining a motion vector and a reference picture index of the current prediction block by using the merging candidate list, the reference picture index of the current prediction block specifying a reference picture of the current prediction block, the reference picture of the current prediction block having a different temporal order from the collocated picture;

obtaining prediction samples of the current prediction block by using reconstruction samples within the reference picture of the current block, the reconstruction samples being indicated by the motion vector of the current prediction block;

obtaining residual samples of a current transform block; and

generating a reconstruct block by adding the residual samples and the prediction samples,

wherein while a reference picture index of the spatial merging candidate is determined based on a reference picture of the spatial neighboring block, a reference picture index of the temporal merging candidate is set to a fixed value of zero

wherein the spatial neighboring block and the temporal neighboring block are determined based on a position of a coding block, a size of a block on which a parallel merge processing is applicable, and a size of the coding block,

wherein the coding block comprises the current prediction block.

100.   Snap's Accused Services perform the method of Claim 1 of the '182 Patent.  An exemplary claim chart is attached as Exhibit 5 and is incorporated by reference herein.

101.   Plaintiffs are entitled to all rights to recover for present, past, and future infringement for the '182 Patent.  Plaintiffs are entitled to recover to the full extent allowable under 35 U.S.C. §§ 284-287, including for up to six years prior to the filing of this complaint.  There is no marking issue under 35 U.S.C. § 287 or otherwise which would limit damages, and Plaintiffs have complied with all relevant statutes for maximum recovery under the law.

### COUNT III: PATENT INFRINGEMENT OF THE '416 PATENT

102.   Plaintiffs incorporate by reference the preceding paragraphs as though fully set forth herein.

103.   Snap had knowledge and notice of the '416 Patent at least by November 24, 2023, and again

27

through communications on November 21, 2025, and the filing of this complaint.

104.    Snap infringes the '416 Patent by, for example, making, using, selling, offering for sale, and/or importing in the United States apparatuses and/or methods covered by one or more claims of the '416 Patent and thus directly infringes the '416 Patent literally and/or under the Doctrine of Equivalents, in violation of 35 U.S.C. § 271.  For example, Snap directly infringes the '416 Patent through its encoding of bitstreams into H.265-compliant (HEVC) formats on servers in the United States.

105.    On information and belief, Snap indirectly infringes claims of the '416 Patent, as provided in 35 U.S.C. § 271(b), by inducing infringement by others, such as Snap's partners and vendors in this District and elsewhere in the United States.  For example, on information and belief, as a result of Snap's inducement, service providers directly infringe the '416 Patent.  Snap has performed and continues to perform these affirmative acts with knowledge of the '416 Patent and with the intent, or willful blindness, that the induced acts directly infringe the '416 Patent.

106.    Upon information and belief, Snap derives revenue, directly and indirectly, from the activities relating to the Accused Services and to infringement of the '416 Patent, including in this District and elsewhere in the United States.

107.    Snap's infringement of the '416 Patent is willful and deliberate.  As detailed above, Snap had knowledge of the '416 Patent and had knowledge, or was willfully blind, as to its infringement of the '416 Patent.  As discussed above, Snap has had actual knowledge of the '416 Patent since at least November 24, 2023, when Access Advance notified Snap of the patent.  Further, as discussed above, Snap knew or should have known that its actions infringe and actively induce infringement of the '416 Patent.  As discussed above, Snap specifically intended that both itself and/or its service providers infringe the '416 Patent.

108.    Snap's infringement of the '416 Patent has damaged and will continue to damage Plaintiffs.

109.    Exemplary claim 1 of the '416 Patent recites:

> 1. A method of generating a reconstructed block, the method comprising:
>
> determining an intra prediction mode for a current block;
>
> generating a prediction block by performing intra prediction on the current block for a DC mode in response to the determined intra prediction mode being the DC mode; and
>
> generating the reconstructed block based on the prediction block and a reconstructed residual block corresponding to the current block,
>
> wherein the performing of the intra prediction on the current block for the DC mode comprises generating prediction values of filtered prediction pixels of the prediction block using a filter for the DC mode using pixel values of reconstructed reference pixels that are adjacent to the current block,
>
> the filtered prediction pixels of the prediction block are one or more pixels located in a vertical pixel line inside the prediction block at a leftmost side of the prediction block, and one or more pixels located in a horizontal pixel line inside the prediction block at an uppermost side of the prediction block, and
>
> a filter shape, filter tap, and a plurality of filter coefficients of the filter for the DC mode are fixed for a plurality of block sizes of the current block.

110.    Snap's Accused Services perform the method of Claim 1 of the '416 Patent.  An exemplary claim chart is attached as Exhibit 6 and is incorporated by reference herein.

111.    ETRI is entitled to all rights to recover for present, past, and future infringement for the '416 Patent.  ETRI is entitled to recover to the full extent allowable under 35 U.S.C. §§ 284-287, including for up to six years prior to the filing of this complaint.  There is no marking issue under 35 U.S.C. § 287 or otherwise which would limit damages, and ETRI has complied with all relevant statutes for maximum recovery under the law.

## COUNT IV: DECLARATORY JUDGMENT THAT PLAINTIFFS HAVE COMPLIED WITH RAND COMMITMENTS

112.    Plaintiffs incorporate by reference the preceding paragraphs as though fully set forth herein.

113.    Snap makes and uses products and services that use and comply with the H.265 Recommendation.

114.    Plaintiffs are prepared to grant licenses to their essential patent claims for implementations of the H.265 Recommendation on a worldwide, non-discriminatory basis and on reasonable terms and conditions, and have at all times been willing to grant such a license to Snap.

115.    Plaintiffs have negotiated in good faith with Snap, including for example, through negotiations between Snap and Access Advance.

116.    Snap has given no indication that it is willing to license Plaintiffs' essential patent claims on RAND terms and has not accepted the offer referenced above.

117.    On information and belief, Snap contends that claims of the Asserted Patents are essential to ITU standards and that Plaintiffs' actions, including the offer previously made to Snap, do not satisfy Plaintiffs' RAND obligations.  Plaintiffs, on the other hand, contend that they have complied with any RAND obligations for their essential claims by offering a license under RAND terms. There is a case or controversy of sufficient immediacy, reality, and ripeness to warrant the issuance of a declaratory judgment.

118.    Plaintiffs seek a declaration that they have negotiated in good faith toward a license with Snap for their essential patent claims and complied with any obligations they have under the ITU IPR Policy and Plaintiffs' relevant Patent Statement and Licensing declarations.

### ATTORNEYS' FEES

119.    Plaintiffs are entitled to recover reasonable and necessary attorneys' fees under applicable law.

### DEMAND FOR JURY TRIAL

120.    Plaintiffs hereby demand a jury trial for all issues so triable.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor as follows and afford Plaintiffs the following relief:

30

A.  Adjudge and declare that Snap infringes claims of the Asserted Patents;

B.  Adjudge and declare that Snap's infringement of claims of the Asserted Patents was willful, and that Snap's continued infringement is willful;

C.  Award Plaintiffs their actual damages going back six years from the date of the Original Complaint due to Snap's infringement;

D.  Award Plaintiffs enhanced damages pursuant to 35 U.S.C. § 284;

E.  Award Plaintiffs pre-judgment and post-judgment interest to the full extent allowed under the law, as well as their costs;

F.  Adjudge and declare that this is an exceptional case and award Plaintiffs their reasonable attorneys' fees pursuant to 35 U.S.C. § 285;

G.  Order an accounting of damages for acts of infringement;

H.  Adjudge and declare that, for Plaintiffs' patent claims subject to a RAND obligation, Plaintiffs have negotiated in good faith and satisfied their RAND obligations; and

I.  Award such other relief, including equitable relief, that the Court deems appropriate.

Dated: July 27, 2026

Of Counsel:

**McKool Smith P.C.**

Kevin Schubert
kschubert@mckoolsmith.com
Emily Tannenbaum
etannenbaum@mckoolsmith.com
McKool Smith P.C.
1301 6th Ave, 32nd Floor
New York, NY 10019

Mitch Verboncoeur
mverboncoeur@mckoolsmith.com
McKool Smith P.C.
303 Colorado Street, Suite 2100

Respectfully submitted,

**FARNAN LLP**

/s/ Michael J. Farnan
Brian Farnan (Bar No. 4089)
Michael Farnan (Bar No. 5165)
919 North Market Street
12th Floor
Wilmington, DE 19801
Phone: (302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Attorneys for Plaintiffs*

31

Austin, TX 78701

Chris McNett
cmcnett@mckoolsmith.com
McKool Smith P.C.
1717 K Street, NW, Suite 1000
Washington, DC 20006

Eric Hansen
ehansen@mckoolsmith.com
McKool Smith P.C.
300 Crescent Ct, Suite 1500
Dallas, TX 75201